UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Action No. 5:13-cr-142-JMH-REW |
| | ) | |
| v. | ) | |
| | ) | |
| SETH JOHNSTON, | ) | **MEMORANDUM OPINION** |
| | ) | |
| Defendant. | ) | |

** ** ** ** **

This matter is before the Court upon Johnston's revised objections to the presentence report. On August 8, 2014, Johnston filed his revised objections, [DE 89], and on September 2, 2014, the government filed its response, [DE 90]. On September 4th and 5th, 2014, the Court conducted a hearing on the matter during which the government presented witnesses and the Defendant testified. At the conclusion of the hearing, the Court announced its ruling from the bench, that the presentence report calculations are supported by the evidence. This opinion supplements the Court's reasoning for that ruling.

I.  **Background**

On October 30, 2013, Johnston pled guilty to Counts 1-6 of the Information. As factual bases for each of the pleas,

1

Defendant agreed to each of the following facts:[1]

    A.    Count 1: Fraud against the plaintiffs in *Abbott et al v. Chesley et al.*

(a) Johnston admits that, from approximately 2008 and continuing through 2010, in Fayette County, in the Eastern District of Kentucky, and elsewhere, he devised a scheme to defraud the plaintiffs in *Abbott et al* v. *Chesley et al.,* by diverting checks collected for purposes of satisfying the judgment obtained for their benefit, and instead utilizing the checks for his personal benefit.

(b) Johnston admits that, in furtherance of his scheme to defraud, Johnston was responsible for helping to collect checks, which were mailed or electronically deposited, from Symetra Financial and The Hartford pursuant to an Order of Garnishment for specific assets of William J. Gallion. Johnston admits that, on numerous occasions, Johnston deposited checks mailed to his law firm pursuant to the Order of Garnishment for the benefit of the plaintiffs, and then withdrew funds from the account and used the funds for his own personal benefit. In total, Johnston admits that he diverted approximately $14,963.05 in funds from checks sent from Symetra Financial and The Hartford pursuant to the Order of Garnishment, and instead, used the money for his own personal use and benefit. Johnston admits that his knowing concealment of his receipt of these funds was material and caused a loss to the victim or victims.

(c) Johnston specifically admits that, in or about May, 2010, for purposes of advancing, furthering, or carrying out the scheme, he caused a check to be delivered by the Postal Service, or by any private or commercial interstate carrier, or took or received any such matter therefrom, to wit, a check in the amount of $688.76 mailed from Symetra Financial to Miller & Wells, PLLC, pursuant to an Order of Garnishment for specific assets of William J. Gallion. Johnston admits that, in furtherance of his scheme to defraud, he

---

[1] Johnston's plea agreement, DE 7 at ID# 22-26. Counts 5 and 6 have been omitted here, as they are not relevant to the discussion.

failed to disclose his receipt of the check to Ford, Ball, or the plaintiffs, and instead misappropriated the proceeds of the mailed check for his own personal benefit.

B. Count 2: Fraud Against the Estate of Cecil Rowlett

(a) Johnston admits that, in or about 2010 and continuing through 2012, in Fayette County, in the Eastern District of Kentucky, and elsewhere, that he devised a scheme to defraud and to obtain money or property by materially false and fraudulent pretenses, representations and promises from the estate of Cecil Rowlett. Cecil Rowlett, a resident of Harlan County, KY, passed away in 2009.

(b) In 2010, Johnston was hired to represent the estate by Brett Rowlett, the executor of the estate. As part of his duties in representing the estate, Johnston was responsible for helping to identify and distribute the assets of the estate in accordance with the decedent's last will and testament and with the order of the Harlan County District Court, Probate Division. The defendant's last will and testament left inheritances to specific individuals in the total amount of approximately $200,000, with the remaining portion of his estate passing to his grandchildren through the laws of intestate.

(c) Johnston perpetrated the scheme to defraud Cecil Rowlett's grandchildren, the residual heirs of his estate through the laws of intestate, by hiding assets of the estate and diverting the money for his own benefit and for the benefit of the executor of the estate, Brett Rowlett. In furtherance of his scheme to defraud, Johnston admits that he represented to Rowlett's grandchildren and to the Harlan County District Court, Probate Division, that Cecil Rowlett's estate contained cash assets of approximately $731,601.38, when Johnston was aware that, in fact, the estate consisted of more than that, the exact amount of which is in dispute. Johnston admits that he utilized the additional cash assets that were not reported to the Harlan District Court, Probate Division, or the grandchildren of Cecil Rowlett, for

3

his own benefit and for the benefit of Brett Rowlett, the executor of the estate.

(d) Johnston admits that, in or about October of 2010, for purposes of advancing, furthering, or carrying out the scheme, Johnston deposited or caused to be deposited any matter to be sent or delivered by the Postal Service, or by any private or commercial interstate carrier, or took or received any such matter therefrom, to wit, a Motion for Partial Distribution of the estate of Cecil Rowlett, with the Harlan County District Court, Probate Division. Johnston admits that the Motion for Partial Distribution contained false representations and that its mailing assisted in carrying out his scheme to misappropriate assets of the estate for his own benefit and for the benefit of Brett Rowlett, the executor of the estate.

C. Count 3: Fraud Involving Villa Paridisio, Solution Ventures, and ATI

(a) The defendant admits that, in or about 2011 and continuing through 2012, in Fayette County, in the Eastern District of Kentucky, with an intent to defraud, he devised a scheme to defraud and to obtain money or property by materially false and fraudulent pretenses, representations and promises from fellow Lexington attorney, Angela Ford.

(b) Johnston admits that he devised the scheme to defraud as a result of Ford allowing Johnston access to approximately $3,500,000 dollars of her own money for the purpose of creating three different LLCs and LLC bank accounts, in the names of Villa Paridisio, Solution Ventures, and ATI. Johnston acknowledges that he was not to spend, invest, or move the money associated with the LLCs or deposited into the bank accounts of the LLCs, without Ford's further instruction. Instead, Johnston was to bill Ford for the time he spent creating the LLCs and any accompanying formation documents.

(c) Johnston admits that he perpetrated the scheme to defraud Ford by gaining access to her money under false pretenses and by misappropriating a disputed

4

amount of Ford's funds without her knowledge, for the purpose of using the money for Johnston's personal benefit. In furtherance of his scheme to defraud, Johnston provided Ford with false documentation, fraudulently representing to Ford that the entire $3,500,000 was being kept in a CDARS account at BB&T Bank of Kentucky for Ford's benefit. In or about July 2012, Ford went to BB&T to inquire about the account and learned that the CDARS account only contained approximately $350,000. Unbeknownst to Ford, Johnston had utilized Ford's money for his personal benefit and to cover shortages of money that resulted from his misuse of other clients' money that had been entrusted to him.

(d) Johnston admits that, in furtherance of the fraud, he knowingly caused a wire transfer of $198,000 to be sent on April 3, 2012, from BB&T Bank of Kentucky in Lexington, KY, to Bank of America, in New York, NY, to fund the purchase of a piece of property in Norco, California, by H.B. and K.B., other clients of Johnston. Johnston admits that he fraudulently used Ford's money to fund the purchase because he had already used H.B. and K.B.'s money, given to Johnston for the purchase of the property, for other purposes, including the purchase of synthetic marijuana. Johnston admits that this transfer was one of many in a complex scheme of money transfers made in an attempt to hide the fraudulent misappropriation of client funds.

D.    Count 4:  Obstruction of Justice

(a) On or about March 28, 2013, in Fayette County, KY, Stacey Birden was served with a federal Grand Jury Subpoena to provide both testimony and documents in her possession related to several individuals, including Seth Johnston, Benjamin Johnston, Julie McGill, Brett Rowlett, and Angela Ford. The subpoena was issued in furtherance of a criminal investigation involving Seth Johnston for various fraud-related offenses. After being served with the subpoena, Seth Johnston was informed about the content of the subpoena by Birden.

(b) Shortly thereafter, both Birden and Benjamin Johnston spoke with Seth Johnston about how to respond to the subpoena. Seth Johnston instructed Birden and Benjamin Johnston to destroy and conceal documents to ensure they could not be provided to the Grand Jury. Following Seth Johnston's instructions, Benjamin Johnston and Birden worked together to locate records to destroy and hide. Birden and/or Benjamin Johnston then took steps to conceal or destroy certain items, including, but not limited to, the throwing away of boxes of records in a dumpster near a storage unit used by Birden and Benjamin Johnston. Law enforcement was able to recover some of these documents from the dumpster.

(c) The defendant admits that he knowingly conspired with both Stacey Birden and Benjamin Johnston to corruptly destroy or conceal documents with the intent to impair their availability for use in the Grand Jury investigation of him for various fraud-related offenses.

## II.  Analysis

The Court now turns to Johnston's objections to the presentence report, noting that sentencing enhancements pursuant to the Sentencing Guidelines must be proven by a preponderance of the evidence.  *United States v. Bowling,* 427 F. App'x 461, 464 (6th Cir. 2011) (citing *United States v. Mickens,* 453 F.3d 668, 673 (6th Cir. 2006)).

### A.   Amount of Loss

The PSR recommended an 18-level enhancement based on an amount of loss exceeding $2,500,000 but less than $7,000,000, pursuant to USSG § 2B1.1(b)(1)(J).  This amount is derived from the three fraudulent schemes to which Johnston pled guilty.

6

First is the $14,963.05 in garnishment checks intended for the *Abbott* plaintiffs. Additionally, it was determined that Johnston, along with Brett Rowlett, defrauded the heirs of the Cecil Rowlett estate in the amount of $1,149,872.45. The lion's share of the loss, however, is attributable to the money Johnston stole from Angela Ford. As Ms. Ford described in her testimony, Johnston created LLCs on behalf of Ford and opened a bank account in the name of the LLCs. He then deposited $3,500,000 of Ford's personal funds into the account, but did not have permission to spend, invest, or otherwise act with respect to the account. In July 2012, however, Ford learned that the account had been drained to a balance of only $350,000. Johnston had misappropriated approximately $3,150,000 of Ford's money, at least some of which he admits he took for his own personal use and to cover shortages resulting from his misuse of other clients' funds. In sum, Johnston stole approximately $4,314,835, which presumptively, makes him eligible for the eighteen-level sentencing enhancement.

Johnston contends that he is entitled to credits against loss "concerning a case involving collateral pledged." Application Note 3(E)(ii) to USSG § 2B1.1 provides that "[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of

sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing," loss should be reduced by that amount. Johnston's plea agreement, along with his hearing testimony, establish that he stole Angela Ford's money via the LLC bank account and used it to provide loans to his "business partners," which were allegedly secured by a gas station located in Frankfort, Kentucky. Johnston reasons that, if the LLCs had ever sought to enforce the promissory notes, they would have been able to seize the property in payment of the debt—and the amount of loss should be reduced by that amount. While this might be relevant to the amount of restitution Johnston will be required to pay, it is not relevant to the amount of loss. The Guidelines permit credits against lost for "collateral pledged or otherwise *provided by the defendant.*" *Id.* (emphasis added). Here, even under Defendant's version of the events, he did not pledge or provide any collateral personally. Accordingly, this provision is inapplicable.

Johnston also argues that amounts recovered from the sale of seized assets, as well as approximately $15,000, which he paid into a restitution fund, should be credited against the amount of loss. Again, these values may impact restitution, but

they do not impact the amount of loss to Johnston's victims.  As for the $15,000 Johnston turned over to the government for restitution, the Guidelines are clear that a defendant should only be credited for money or property returned to the victim prior to the time the offense was discovered by the victim or a government agency.  USSG § 2B1.1, Application Note 3(E)(i). Johnston did not return the $15,000 until around the time of his guilty plea.  Accordingly, he is not entitled to credit against loss for that amount.

Finally, Johnston urges that he is entitled to an offset against the $15,000 stolen from the *Abbott* plaintiffs based on legal services provided to Angela Ford.  The Court has seen no evidence that Johnston was not paid for legitimate legal services provided to Ford and, accordingly, this argument must be rejected.

### B.    Number of Victims

If an offense involves more than 250 victims, a defendant's base offense level should be increased by six levels.  USSG § 2B1.1(b)(2)(C).   It is evident, from the facts admitted in Johnston's plea agreement, as well as the hearing testimony, that the number of Johnston's victims exceeds 250.

Johnston has admitted that he "diverted" nearly $15,000 in garnishment checks obtained for the *Abbott* plaintiffs and used

the money for his own personal benefit.  He further admitted that his knowing concealment of his receipt of the funds was material and it caused a loss to the victims.  It is undisputed that the number of these *Abbott* plaintiffs exceeds 250.

The Sentencing Guidelines define "victim," in relevant part, as "any person who sustained any part of the actual loss determined under subsection (b)(1)."  USSG § 2B1.1, Application Note 1.  Hearing testimony established that the 382 *Abbott* plaintiffs sustained actual loss.  Angela Ford testified that when Johnston's law firm received garnishment checks for the benefit of the *Abbott* plaintiffs, they were to be turned over to a receiver, where they would accumulate until a distribution was made to the plaintiffs.  She further testified that two distributions were made after Johnston took the $15,000 in garnishment checks and that those checks would have been included in one of the distributions had Johnston not stolen them.

Johnston has offered no evidence to refute Angela Ford's testimony, but he does argue that the *Abbott* plaintiffs are not victims because the $15,000 ultimately remained in Ford's control.  He contends that, rather than turning the money over to the receiver, he deposited it into a general account at his firm, where it was commingled with other funds, and ultimately

transferred to a Johnston Legal PSC escrow account when Johnston started his own law practice. This escrow account, Johnston states, was seized by Angela Ford pursuant to her civil action against him. He reasons that Ford's purported seizure of his escrow account alleviates him of the loss he caused to the *Abbott* plaintiffs. He is incorrect. Even if Johnston's version of events is true, it does nothing to change the fact that distributions were made to the *Abbott* plaintiffs and, but for Johnston's actions, the amount distributed would have been $15,000 greater. Accordingly, each of the 382 *Abbott* plaintiffs was a victim of Johnston's conduct.

### C. Violation of Prior Court Order

United States Sentencing Guidelines § 2B1.1(b)(9)(C) provides that if an offense involved "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines," the base level should be increased by two. Two alternate bases exist for imposing the enhancement in this instance.

Brett Rowlett, executor of the estate of Cecil Rowlett, hired Johnston to act as attorney for the estate. As Johnston has admitted, he knowingly represented to the Harlan County District Court, Probate Division, that Rowlett's estate consisted of fewer cash assets than it actually did—a

11

discrepancy that has been determined to be nearly $1,500,000.

He argues, however, that he did not act in violation of any

orders or processes of the Harlan District Court because the

orders only directed Brett Rowlett, as executor, to take certain

actions and did not order Johnston to do anything.   While

Johnston's argument certainly presents a convenient escape hatch

for him, it is unavailing.   There is no question that Johnston

schemed with Brett Rowlett to defraud Cecil Rowlett's heirs and,

in doing so, acted in contravention of the Harlan District

Court's order in which it directed that all cash in the estate

be transferred to the beneficiaries.   Importantly, on January 6,

2011, Johnston signed and filed with the court an inventory of

the   Rowlett   estate,   which   he   knew   to   be   fraudulent.

Additionally, Johnston was on the distribution list for the case

and, although he insists that Brett Rowlett was directing any

court filings, there is no indication that Johnston, as attorney

of record, did not submit the filings himself.   In doing so, he

acted in violation of the orders of the court, as well as Harlan

District Court's probate process, making a two-level enhancement

appropriate.

Further, Johnston acted in violation of this Court's

previous order directing him to avoid communications with his

co-defendants.   Following the acceptance of his guilty plea,

Johnston was ordered to avoid contact with Stacey Birden and was admonished that this included indirect contact by passing messages by family members. However, a telephone conversation between Johnston, while in custody, and his parents reveals that Defendant blatantly violated this order. During the recording, Defendant is heard instructing his parents to have "Jack" delete text messages—that the last thing he needs is "her" probation officer walking in and saying "give me your phone." It is undisputed that "Jack" is actually Stacey Birden. Much of the conversation is focused on providing Johnston with a South Carolina address, which Johnston's mother eventually finds and relates to Johnston. Government witness Agent Joe Mountz testified that the sought after address is that of Stacey Birden's mother, and Johnston does not dispute this. Other topics of conversation include Birden's general state of well-being and Johnston's inquiry regarding Birden's reaction to a cryptically-described Christmas gift. This evidence is more than sufficient to establish that Defendant acted in violation of the Court's order that he avoid contact with Birden.

### D. Sophisticated Means

The Sentencing Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG

§ 2B1.1 cmt. n. 8.   Further, "a series of criminal actions may constitute sophisticated means even if none of the offenses, standing alone, is especially complex or especially intricate." *United States v. Masters,* 216 F. App'x 525 (6th Cir. 2007) (internal quotation marks omitted).   If an offense involves sophisticated means, a two-level increase is appropriate.   USSG 2B1.1(b)(10)(C).

While Johnston argues that this enhancement is inapplicable, he admitted in his plea agreement that he participated in a complex scheme of money transfers made in an attempt to hide the fraudulent misappropriation of client funds. His pattern of conduct, particularly with respect to Angela Ford, demonstrates that he did, indeed, go to great lengths to steal clients' money and then attempt to cover it up.   For example, in an attempt to persuade Ford to deposit her money at BB&T in Lexington, Kentucky, where Johnston's brother was employed, Johnston presented Ford with false documents describing the terms of the account.   Further, after Johnston deposited Ford's $3,500,000 into the account, he created forged statements showing that the balance remained at three and one-half million dollars, when he had actually spent all save approximately $350,000.   Johnston admits that he used some of Ford's money to fund a property purchase for other clients,

whose funds he had already used for other purposes, including the purchase of synthetic marijuana. While Johnston contends that, in his world, these actions are not sophisticated or complex, the Court is persuaded that his conduct meets the Guidelines definition and that the two-level enhancement is warranted.

### E. Obstruction

"If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct," the Court is advised to increase the base offense level by two levels. USSG 3C1.1.

Portions of Stacey Birden's plea agreement were read into evidence during the hearing in this matter. In her plea, Birden stated that, from jail, Johnston instructed Birden and Defendant's brother Benjamin Johnston regarding documents that should be destroyed or concealed and not provided to the grand jury. Birden and Benjamin Johnston then worked together to locate records to destroy, including throwing away boxes of records in a dumpster near a storage unit. Under cross-examination at the hearing, Johnston testified that Birden and

Benjamin Johnston were not involved in the underlying crime involving the Rowlett estate and admitted that they would have had no way to know which documents to dispose of without his instructions. He recalled telling them, "please don't get this any bigger than it has to be." During the hearing, Johnston admitted that he did, in fact, instruct his brother and Birden to destroy documents so that they could not be provided to the grand jury. This, without question, meets the Guidelines definition of obstruction.

Johnston urges that his obstructive actions in no way diminish his acceptance of responsibility. However, it is an extraordinary case in which both the obstruction of justice enhancement and credit for acceptance of responsibility will apply. USSG § 3E1.1 cmt. n.3; *United States v. Verduzco,* 558 F. App'x 562, 566 (6th Cir. 2014). This is not such a case. Johnston's violation of the Court's order prohibiting contact with Stacey Birden, as well as his instructions to Birden and Benjamin Johnston to destroy documents, indicate that he has failed to accept responsibility for his actions. The timing of these actions also indicates that Johnston has not accepted responsibility for what he has done. *See United States v. Logan,* 542 F. App'x 484 (6th Cir. 2013) (internal citation omitted) ("Even more significant is the fact that, unlike the

defendant in [another case determined by this court to be extraordinary, the defendant's] obstructive conduct happened *after* he was indicted."). Accordingly, Defendant is not entitled to credit for acceptance of responsibility.

## F.   Criminal History

In August 2010, Johnston was arrested for driving under the influence—a charge to which he pled guilty and received a sentence of thirty days in jail probated for one year, plus a fine and costs. This creates one criminal history point. *See* USSG § 4A1.2(c)(1). Johnston does not dispute that he committed the criminal conduct to which he has pled guilty during his period of probation for the DUI offense. Accordingly, the addition of two criminal history points is appropriate pursuant to USSG § 4A1.1(d). Johnston's total criminal history score is three, resulting in a criminal history category of II. *See* USSG, Chapter 5, Pt. A.

Johnston argues that this calculation overstates his criminal history because he received a harsher than usual penalty for his DUI conviction. Kentucky Revised Statutes § 189A.010(5)(a) provides that, for a first DUI offense, a person shall be fined between $200 and $500 and shall be jailed for a period of forty-eight hours to thirty days. The trial court is also free to impose a period of probation of up to two years.

17

*See* KRS § 533.020(4).  Accordingly, the penalty Johnston received for the DUI was well within the range that the Fayette District Court could have imposed.  Further, the Court is not aware of all of the circumstances surrounding Johnston's arrest and conviction for this offense and, therefore, cannot say that the punishment was harsher than that for similarly situated individuals.

## III. Conclusion

For the foregoing reasons, the Court finds that the offense level and criminal history computations as stated in the Presentence Report are properly calculated.

This the 12th day of September, 2014.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge